**In re Charles R. BECK, fka C–Beck, dba Classic Stone Restoration, Debtor.**

No. 02–51657–ASW.

United States Bankruptcy Court, N.D. California.

March 29, 2004.

Stanley A. Zlotoff, Law Offices of Stanley A. Zlotoff, San Jose, CA, for Debtor.

## MEMORANDUM DECISION DENYING MOTION TO DISMISS CASE AND OBJECTION TO CONFIRMATION OF PLAN

ARTHUR S. WEISSBRODT,
Bankruptcy Judge.

Before the Court are two matters initiated by BTI Group ("BTI"), a creditor of Charles R. Beck ("Debtor"), who is the debtor in this Chapter 13 [1] case:

1/ A motion to dismiss the Chapter 13 case with prejudice, alleging that the Debtor filed his bankruptcy case in bad faith.

---

**1.** Unless otherwise noted, all statutory references are to the Bankruptcy Code, Title 11 United States Codes, as it provided with respect to cases commenced on March 25, 2002, when the Debtor filed the Chapter 13 petition in this case.

2/ An objection to confirmation of the Debtor's Chapter 13 Plan, alleging that he is not eligible for Chapter 13 due to lack of regular income, and has proposed a Plan in bad faith that fails to treat unsecured creditors as well as they would be treated under Chapter 7 and does not include all disposable income.

Creditor Nancy Lietzke ("Lietzke") has joined in BTI's dismissal motion, but did not join in BTI's objection to confirmation. She filed her own objection to confirmation alleging that the Debtor filed bankruptcy and/or his Plan in bad faith, but stated at trial that she would not pursue her objection and would be bound by the Court's decision on BTI's objection.

The Debtor is represented by Stanley A. Zlotoff, Esq. ("Zlotoff"). BTI is represented by Julie H. Rome–Banks, Esq. of Binder & Malter LLP. Lietzke represents herself.

Both matters have been tried and submitted for decision.[2] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure ("FRBP").

## I.

### FACTS

It is undisputed that, prior to commencement of this Chapter 13 case on March 25, 2002: the Debtor filed a Chapter 7 petition on October 13, 1999; a discharge was issued in that case on January 31, 2000; and the discharge was revoked on September 5, 2001 pursuant to § 727(d)(3) and § 727(a)(6) based on the Debtor's "refusal to obey" two Court orders directing him to produce documents and appear for examination under FRBP 2004 by BTI. The Debtor was not represented by counsel when the Chapter 7 case was commenced, and that petition shows that the bankruptcy documents were prepared by a "Non–Attorney Petition Preparer" pursuant to § 110. By the time of the discharge revocation proceedings, the Debtor was represented by attorney Edward Kent ("Kent")—he testified that he "left everything up to" Kent including the document production to BTI, and "there was a number of documents [Kent] said he wanted and I gave him what I had". The Debtor said that he did not expect his discharge to be revoked and was "surprised" when it occurred.

Kent represented the Debtor in filing the Chapter 13 petition and supporting documents. The Debtor testified that Kent "had the paperwork from the 7" and "got the information for the 13 paperwork from the 7", as well as from asking the Debtor "some questions". According to the Debtor, he "trusted [Kent] completely and we had a number of discussions so I went in and signed [the Chapter 13 forms]

**2.** Another objection to confirmation remains pending and has not been tried. Devin Derham–Burk, the Chapter 13 trustee ("Trustee"), filed an objection alleging that Debtor's Plan was defective with respect to various administrative matters, fails to meet the Chapter 7 test of § 1325(a)(4), and is not feasible. The Trustee's objection was not on calendar for trial with BTI's objection, and the Trustee did not appear at trial. Rather, the Trustee filed a statement saying that "[The Trustee] also has an objection to confirmation. Part of [the Trustee's] objection addresses similar issues raised by [BTI's] objection, but the balance of the objection addresses administrative issues which do not rise to the level requiring an evidentiary hearing. [BTI] is represented by capable counsel. Participation in the trial by [the Trustee] would merely duplicate counsel's presentation and needlessly draw upon the Court's time. Therefore, so as not to burden the court with duplicative efforts [the Trustee] will not appear at the trial".

when he called me. He told me to look them over and I did briefly"—the Debtor said that he did not read the documents "completely", but believed them to be accurate when he signed them. BTI pointed out various discrepancies between the two cases with respect to information stated by the Debtor in each—for example:

The Chapter 7 Schedules list only one vehicle, a 1998 Chevrolet Blazer valued at $2,500, whereas the same car is valued in the Chapter 13 case at $5,350. The Debtor testified that the first value was an estimate based on his own opinion, but the second was the result of Kent having "looked up the value in the Blue Book".

The Chapter 13 Schedules list both the 1998 Blazer and a 1956 Chevrolet sedan valued at $800. The Debtor testified that he received the 1956 sedan from a customer as payment for work done—he could not recall whether that occurred before or after commencement of the Chapter 7 case, but did not believe that he owned it when he filed the Chapter 7 petition.

The Chapter 13 Schedules list a judgment debt of $503.96 to Pinas Barak Marble Services Company and show it to have been incurred April 5, 1999, approximately six months prior to commencement of the Chapter 7 case. That debt is not scheduled in the Chapter 7 case, and the Debtor testified that he "forgot all about it" when completing the Chapter 7 forms.

The Chapter 7 Schedules list no tax creditors, whereas the Chapter 13 Schedules list both the Internal Revenue Service and the California Franchise Tax Board

("FTB") with the amounts shown to be "$0.00" (amended on September 4, 2002 to list the amount owed to FTB as $88,194.91).[3] The Debtor testified that he did owe taxes to the FTB for 1989 and 1990, but was not aware of it when he filed his Chapter 7 petition in 1999 and never received notice of a tax lien filed by FTB. When the Chapter 13 petition was filed in 2002, the Debtor was "under the impression they'd written that off so they weren't owed, because I'd heard nothing from them", although he received no notice of FTB's tax lien having been released. With respect to FTB's proof of claim, the Debtor said "if they say I owe this amount that's what I owe them".

The Chapter 7 Schedules list the Debtor's occupation as "handyman" for ten months, whereas the Chapter 13 Schedules list it as a self-employed "trainer" for one and a half years (which period was amended in September 2002 to eleven months). The Debtor testified that the paralegal who prepared his Chapter 7 forms recommended the term "handyman" because "they didn't know what the devil to call me", and said that ten months "may not be an accurate period of time". As for the occupation of "trainer" scheduled in the Chapter 13 case (i.e., for the Debtor to train people to seal or repair stone), the Debtor stated at his § 341 meeting on May 6, 2002[4] that "It's a program I'm putting together ... it's something we're starting up. We've been working on it for about six months. We haven't really done it yet. We had to put the program together and

---

**3.** FTB filed a proof of claim in the Chapter 13 case on June 20, 2002 for $88,148.51, as a secured claim. Zlotoff objected to the secured status and the claim was then amended to seek the same amount as a general unsecured claim.

**4.** The § 341 meeting was conducted in two sessions, the first on May 6, 2002 and the

second on June 3, 2002. By the time of the first session, Kent was in the process of being replaced by the Sutton Law Group ("Sutton Firm"), and counsel from the Sutton Firm appeared with the Debtor at each session. Ms. Sutton passed away and the Sutton Firm was replaced by Zlotoff in January 2003.

start marketing it. It hasn't been done yet.... I've been doing training for about six months or better, give or take, and I was doing restoration prior to that. ... Actually, it's been about eight months, we started putting the program together". At trial, Debtor testified that the training business was "underway" at the time of the § 341 meeting, although "we hadn't sold any training yet, we were working on the marketing and other things, but technically we were trying to sell this product". The Debtor also testified at trial that he was earning income by "sealing stone" when the Chapter 13 case commenced, but he scheduled his occupation as "trainer" "because that's what I was proposing to do and that's what I was trying to get going, I was strictly sealing stone to create some income so I could eat"; the Debtor testified to this same effect at the second session of his § 341 meeting on June 3, 2002. At trial, the Debtor said that he told Kent what kind of work he was doing and there was "no argument" about using the term "trainer" in the Chapter 13 Schedules.

BTI also noted discrepancies between the Debtor's tax returns and the documents filed in the Chapter 7 case. The tax return for 1999 shows business income of only $1,800, whereas the bankruptcy documents show it as $12,000 for that year. The Debtor testified that the latter figure was what he believed his total gross sales were for the calendar year to date, whereas the figure on the tax return was not the gross and reflected the whole year's actual activity. He said that he was "rather nervous" while completing the Chapter 7 forms, which he did in one day with a paralegal "as best I could" and without referring to his records.

BTI also pointed out conflicting information in the Chapter 13 case and the Debtor's testimony at the § 341 meeting concerning a Jaguar automobile. The Chapter 13 Statement of Financial Affairs states that a 1988 Jaguar XJ6 worth $2,500 was seized in September 2001 by San Jose British Motors at 4040 Stevens Creek Boulevard in San Jose, and the originally filed Schedules do not list the car as an asset. Debtor testified at the § 341 meeting on May 6, 2002 that he had placed the car with a repair shop named British European on Winchester approximately a year ago, could not afford to pay for the work, and "I believe they lien-saled it", but he had not talked to them "in a long time" and had "no idea" whether they still had the car—he said that he did not know the vehicle's mileage and "just used a guess" for the value, "what I would probably pay for the vehicle". At the second session of the § 341 meeting, the Debtor testified that his new attorney told him to "check it out" about the Jaguar so he did, and learned after the first session of the § 341 meeting (either later that same day or the next day) that the Debtor's sons and his brother, Edgar Barnes, "took care of the bill" at British European for over $1,000 and were going to have the car restored as a gift to him. He said that his sons lived at his wife's property on Rochin Terrace in San Jose and were "hiding" the car from him at that address until Father's Day. Debtor acknowledged at that § 341 meeting that he never received a written notice that the Jaguar would be sold at a lien sale. Lietzke testified at trial that she had examined the Debtor in January 2002 in connection with a Small Claims Court judgment that she had received against him, and that he told her then that he owned the Jaguar but that it was at British Motors and subject to their lien, he did not expect to recover it, and the lienholder might already have sold it. Lietzke said that the Debtor had previously driven a burgundy Jaguar to her house and she saw it at the Debtor's

residence on Blossom Hill Drive in San Jose two days prior to the May 6, 2003 § 341 meeting—then she went to the Rochin Terrace address after that meeting and recognized the car there under a car cover with one burgundy wheelwell exposed, next to a black Jaguar. Lietzke testified that she talked to the owner of the repair shop and was told that he had never had a lien on the car, it had been brought in for repairs during October 2001, was paid for with a credit card over the telephone by Edgar Barnes in January 2002, and picked up that month. The Debtor testified at trial that his testimony at both sessions of the § 341 was accurate, he believed when he filed the Chapter 13 petition that the Jaguar had been sold under a lien, and he told Kent about it but was not aware whether Kent investigated the car's status while completing the Chapter 13 forms. The Chapter 13 Schedules were amended on September 4, 2002 to list the Jaguar as an asset with a value of $1,500, annotated with the phrase "Title in Debtor, possession in Debtor's son"; the amended Schedules also claim the car exempt in the amount of $1,500 pursuant to California Code of Civil Procedure § 703.140(b)(1).

Lietzke testified about her unsecured claim against the Debtor for $3,705, which is represented by a Small Claims Court judgment for $3,554 plus various costs. Lietzke's judgment was issued on September 26, 2001 after she filed a complaint for damages caused by the Debtor's allegedly defective work at her home. She testified that she wanted marble restoration done and called several "stone companies" in May 2001, one of which referred her to Classic Stone Restoration. She called that business, the Debtor came to her home, and they entered into a written contract on June 4, 2001. Lietzke testified that, before deciding to hire the Debtor, she asked him if he was licensed and he said "yes"— she noted that there was no license number on the contract, and the Debtor said that he did not put the number on the contract because others might use it. Lietzke understood the Debtor's statement to mean that he held a contractor's license and that was "important" to her "because, as a consumer, it gives me more security because these people have been checked out, they're possibly bonded by the state, that their work perhaps has been looked at before". She said that she had never hired unlicensed workers other than gardeners and, had she known the Debtor had no license, she might have interviewed others or asked for references, but she "trusted" the Debtor and felt "comfortable" hiring him. Lietzke testified that she later learned from the State contractor's license board that the Debtor did not have a contractor's license. The Debtor testified that he had not had one since approximately 1988 when he was doing marble fabrication work, and his "understanding" was that he did not require such a license for the marble restoration work he performed—he said that he did have a business license, or at least "I thought I did". Lietzke testified that the Debtor did not restore the marble in her home properly and in fact damaged it, along with fixtures and hardware. Lietzke told the Debtor she would complain to the State contractor's license board unless she and the Debtor were able to settle the matter, and said that the Debtor replied "fine, take me there, been there before, there's nothing they can do to me".

Lietzke's written contract states at the top "Classic Stone Restoration" and at the bottom "Please make all payments payable to our corporate name: CBECK"; it is signed by the Debtor on a line under the

name "CBECK".[5] Lietzke testified that she issued one check to Classic Stone Restoration and two to CBECK, all of which were deposited into a bank account held by Helen Rochin aka Helen Beck, whom the Debtor testified is his wife—according to the Debtor, he had no checking account at that time and he deposited checks into his wife's account because he owed her money for rent and loan payments.[6] Lietzke testified that, when she examined the Debtor in State Court about his assets, he told her that the spouses had a post-nuptial agreement that prevented his creditors from reaching his wife's assets. According to Lietzke, the Debtor said that her collection efforts would be futile because he was going to file bankruptcy—nevertheless, he did agree to pay her a reduced amount within a few weeks, which was never done. At trial, the Debtor testified that he and his wife were separated when he filed the Chapter 13 petition and still were, and confirmed that they had entered into a post-nuptial agreement on September 12, 1988, which had never been rescinded. The Debtor also testified that his wife owns the house on Rochin Terrace but does not live there and his sons rent it from her—he said that he had lived there "when we were together" and paid rent during that time, but his residence on the dates of both bankruptcy cases and at time of trial was the Blossom Hill property, which is owned by his mother and his brother. According to the Debtor, a quitclaim deed was recorded on May 3, 2000 that conveyed any of the Debtor's interest in the Rochin Terrace property to his wife—he said that his wife inherited the property from her mother and a title company requested the quitclaim deed in order to dispose of any possible community property interest of the Debtor's, although the Debtor did not believe that he ever had any such interest.

John R. Mittelstet ("Mittelstet") testified that he is a Senior Vice President of BTI, which is a business brokerage firm that assists owners in selling small businesses. The Debtor and BTI entered into a written "Representation Agreement" ("Agreement") dated March 24, 1997 under which the Debtor gave BTI the exclusive right to sell CBECK[7] for one year at a price of $350,000, and agreed to pay BTI a commission (the greater of $20,000 or 12% of the purchase price) if sale occurred during that period. According to Mittelstet, the Debtor wanted to sell CBECK because a hotel chain had asked him to train its janitors in marble restoration and he wanted to pursue that, but could not run CBECK at the same time because it consisted only of himself and a helper— Mittelstet said that, at the time of the Agreement, "every indication he gave us was that he was very motivated to sell". Mittelstet described "what we were selling" as a "special proprietary technique" that Debtor claimed to have along with goodwill established by CBECK—the Agreement also called for sale of a 1987 truck and some fixtures and equipment, included the Debtor's promise to train the buyer for four weeks at 40 hours per week, and provided a covenant not to compete

---

5. The Debtor testified that, at that time, CBECK was a corporation "according to the State of California". He said that "we were told we could act as a corporation if we would finish the paperwork and that's what we were doing", but the process was never completed due to lack of funds.

6. The Debtor said that many of his customers paid him in cash; when they gave him checks, his practice was to cash the checks at the makers' banks.

7. The Agreement identifies the business as a proprietorship rather than a corporation.

for five years within 100 miles.[8] Mittelstet said that BTI "felt we could deliver" a price roughly equivalent to twice the business' net income, which the Debtor reported as $181,251.99 for the prior year of 1996, so the $350,000 asking price was consistent with the business' performance. In January 1998, the Debtor and BTI entered into an "Amendment To Representation Agreement" ("Amendment"), increasing the sale price to $450,000 and reciting "Termination Date changed to: 9–24–98"—Mittelstet said that the date was changed "in combination of an increase in price, we agreed to increase the price and he agreed to give us longer to sell it". Mittelstet testified that the Debtor wanted to increase the asking price because he had completed his 1997 tax return and it showed net income of $360,000, which was "significantly" more than the 1996 figure that was the basis for the original asking price of $350,000. Mittelstet said that he and the Debtor decided not to fix the new price at double the 1997 net income because no offers had been received when the asking price was approximately double the 1996 net income—instead, they agreed to ask $450,000. However, Mittelstet also said that the lack of offers under the original Agreement was "an indication that we're probably out of range on the price", so BTI had previously asked the Debtor to reduce the price. Mittelstet testified that an offer was received soon after the Amendment was signed, but for only $360,-000—then an offer was received in mid-May 1998 from Montgomery Herman ("Herman") for the full price of $450,000.[9] Mittelstet said that he discussed the Her-

man offer with the Debtor by telephone and the Debtor stated that he had changed his mind and no longer wanted to sell the business. Mittelstet said that he then explained that the Agreement called for BTI to receive a commission at 12% of $450,000 if a full price offer from a ready, willing, and able buyer was delivered, which condition had been performed by BTI, so the commission was payable even if the Debtor no longer wanted to sell CBECK. According to Mittelstet, the Debtor seemed to be "surprised that we would take that stand" and said "there was no way he was going to pay the thing, if we pursued it we would just wind up spending a lot of money for attorney fees and he would wind up never paying anything". Mittelstet said that BTI then sent one or two letters to the Debtor, demanding payment while also "beseeching" him to accept the "really good offer for what amounted to a one person business", but the only response was a telephone message left by the Debtor at 6:30 one morning "to the effect that he was outraged we were still trying to collect and no way he would pay what we were asking for", in a tone of voice that was "angry and very assertive". BTI then proceeded to binding arbitration under the Agreement and received a judgment on July 29, 1999 for $71,447.58—BTI has filed a proof of unsecured claim in this Chapter 13 case for the sum of $90,413.81, representing the principal amount of the judgment plus pre-petition interest.

The Debtor testified that he did intend to sell CBECK when he entered into the Agreement, but changed his mind some six

---

8. The Agreement does not allocate the asking price among the various elements of the business and Mittelstet testified that such allocations are typically negotiated between the seller and the buyer. Mittelstet said that he considered the primary element of value to be the business' goodwill, and also stated that he

believed it "highly unlikely" for sale of a business such as CBECK without a non-competition covenant to be "feasible".

9. Mittelstet testified that Herman was represented by another BTI agent, Roy Justesen, but Mittelstet had not previously met him.

to nine months later and told BTI that he no longer wanted to sell, for three reasons: first, "I now knew it was doing a lot better"; second, he wanted to develop a training business and "decided it would be better to keep my business and use that as the vehicle for doing the training in"; third, he had told BTI at the outset that "I didn't want this just put on multiple listings, I wanted somebody who was going to work for me", and he thought that BTI had "not done a good job of selling". However, when BTI told him that he would still have to pay their commission, "I said if this is the game they're going to play I'm going to play hardball too, the price is $450,000", and he entered into the Amendment "so I wouldn't be forced to sell the business, I was under the impression I was stuck". According to the Debtor, Mittelstet prepared the Amendment, the Debtor asked why it changed the termination date, and Mittelstet explained the change as "just to guarantee the price so I can't go to another company to sell at a lower price and skirt them out", but "it was not meant as an extension of the contract". With respect to the Herman offer, the Debtor testified that he did not consider it "legitimate" because the Debtor told Herman that he was not interested in selling the business (though he would be willing to sell Herman a training program to start a new business in a different area), so Herman should have realized that the Debtor would not be "very motivated to be sure he was successful" and should not be interested in making a full price offer under such circumstances.

The Debtor testified that the business ultimately was "closed down" because he "was not paying attention to business because of a gambling habit" and it "just went under". He said that the business equipment was "sold off cheap, pawned off, whatever", and the business truck was repossessed. The Debtor testified that, at commencement of the Chapter 13 case and at time of trial, "the main thing that creates income for me at the present moment and as far as I know the rest of my life is sealing stone", though he continued to attempt to "put together a training package" but had not been able to "get it off the ground". He said that he worked out of his home with no employees, equipment, or supplies other than rags and chemicals, an "unreliable" 1956 truck that runs "sometimes", and a borrowed 1988 truck. The Debtor testified that he had told the Trustee that his sealing business was worth between $15,000 and $20,000, which he based on one year's income and which represented the price that he would want to receive if he were to sell it—but he did not think that he would receive that much unless he also gave a non-competition covenant, and believed the value of the business would be "zero" without such a covenant. The Debtor testified that his income on the date of bankruptcy and at time of trial averaged between $1,500 and $1,800 per month, "summer months are really low and winter months it picks up", and the $1,800 monthly income shown in the Chapter 13 Schedules was a "good average". He said that the expenses totaling $1,575 listed in the Chapter 13 Schedules were accurate when the case commenced and were "more or less" the same at time of trial.

## II.

### ANALYSIS

BTI, joined by Lietzke, seeks dismissal of the Chapter 13 case with prejudice. If that motion is granted, BTI's objection to confirmation of the Debtor's proposed Plan will be moot—if that motion is denied, BTI objects to confirmation of the Debtor's proposed Plan.

## A. Dismissal

Involuntary dismissal of a Chapter 13 case is governed by § 1307(c), which provides in its entirety as follows:

(c) Except as provided in subsection (e) of this section [concerning farmers], on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, including—

(1) unreasonable delay by the debtor that is prejudicial to creditors;

(2) nonpayment of any fees and charges required under chapter 123 of title 28;

(3) failure to file a plan timely under section 1321 of this title;

(4) failure to commence making timely payments under section 1326 of this title;

(5) denial of confirmation of a plan under section 1325 of this title and denial of a request made for additional time for filing another plan or a modification of a plan;

(6) material default by the debtor with respect to a term of a confirmed plan;

(7) revocation of the order of confirmation under section 1330 of this title, and denial of confirmation of a modified plan under section 1329 of this title;

(8) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan other than completion of payments under the plan;

(9) only on request of the United States trustee, failure of the debtor to file, within fifteen days, or such additional time as the court may allow, after the filing of the petition commencing such case, the information required by paragraph (1) of section 521; or

(10) only on request of the United States trustee, failure to timely file the information required by paragraph (2) of section 521.

Since § 102(3) provides that the term "including" is not limiting, the list set forth at § 1307(c)(1)-(10) is a non-exclusive one that does not define the term "cause" but merely illustrates examples of it. In the Ninth Circuit, an additional form of "cause" for involuntary dismissal consists of filing a Chapter 13 petition in bad faith, see In re Eisen, 14 F.3d 469, 470 (9th Cir.1994):

A Chapter 13 petition filed in bad faith may be dismissed "for cause" pursuant to 11 U.S.C. s 1307(c) [citations omitted] .... To determine bad faith a bankruptcy judge must review the "totality of the circumstances." In re Goeb, 675 F.2d 1386, 1391 (9th Cir.1982). A judge should ask whether the debtor "misrepresented facts in his [petition or] plan, unfairly manipulated the Bankruptcy Code, or otherwise [filed] his Chapter 13 [petition or] plan in an inequitable manner." Id. at 1390. "A debtor's history of filings and dismissals is relevant." In re Nash, 765 F.2d 1410, 1415 (9th Cir. 1985). Bad faith exists where the debtor only intended to defeat state court litigation. In re Chinichian, 784 F.2d 1440, 1445–46 (9th Cir.1986).

BTI relies on bad faith as cause for dismissal, contending that the Debtor filed his Chapter 13 petition for the improper purpose of defeating creditors' claims rather than for the legitimate purpose of including them in a bona fide financial reorganization. BTI argues that the totality of circumstances shows that: the Debtor's Chapter 7 discharge was revoked because he ignored Court orders in that case; he took a "cavalier" approach to the accuracy of the documents filed in both of his bankruptcy cases; he has attempted to shelter

assets with a post-nuptial agreement and by hiding them in his wife's bank account and at her home; he has vowed that he will not pay Lietzke and BTI; and he seeks to discharge those creditors' debts in Chapter 13 to avoid the non-dischargeability provisions of Chapter 7.

With respect to the revocation of the Chapter 7 discharge, the record shows that BTI was granted that relief upon a motion for summary judgment to which the Debtor did not respond. The revocation was based upon the Debtor's failure to obey Court orders that directed him to appear for examination and produce documents as requested by BTI under FRBP 2004—*i.e.*, revocation was equivalent to the extreme sanction of dismissing an action when the plaintiff fails to provide discovery. At that time, the Debtor was represented by Kent and he testified at trial that he relied on his attorney and gave him all documents that he had, and was "surprised" to find that his discharge was revoked. There is no evidence to the contrary, and it may well be that the Debtor's failure to abide by the FRBP 2004 orders was caused by his attorney's inaction rather than by willful disobedience on his own part.[10] Under these circumstances, the fact that the Debtor's Chapter 7 discharge was revoked is not a strong indication that the Debtor's general attitude is marked by bad faith, or that he commenced this Chapter 13 case in bad faith following the revocation.

■ Concerning discrepancies in the bankruptcy documents, BTI cites *In re Duplante*, 215 B.R. 444, 447 n. 8 (9th Cir. BAP 1997) (*"Duplante"*), which notes that schedules and statements of financial affairs are "sworn statements, signed by debtors under penalty of perjury. Adopt-

ing a cavalier attitude toward the accuracy of the schedules and expecting the court and creditors to ferret out the truth is not acceptable conduct by debtors or their counsel". That case did not concern the issue of bad faith, but dischargeability of a credit card debt—the creditor relied in part on the schedules showing that large debts were incurred at times when the debtor lacked ability to pay, and the debtor's attorney argued that "schedules and statements of financial affairs are not necessarily precisely correct, and that it is the burden of a creditor to attend a section 341 meeting or conduct a Rule 2004 examination to ascertain the true financial condition of a debtor", *Duplante*, at 447. Although *Duplante* is not on point, this Court agrees that a "cavalier attitude" toward the accuracy of documents signed under penalty of perjury is never "acceptable conduct", and it clearly bears upon the good faith of the signatory. However, that does not appear to be what happened in this case. The Chapter 7 documents were filed with a paralegal and the Debtor testified that he did so in a hurry while "rather nervous" and without benefit of his records—he said that the value of his car and his gross sales to date were estimated, he forgot a $503.96 judgment against him, and he did not know that he owed taxes to the FTB. The Chapter 13 documents were prepared by counsel who the Debtor "trusted completely", who had access to the Chapter 7 documents and also received information from the Debtor—they are inaccurate about the status of the Jaguar and the Debtor's occupation, both of which the Debtor testified he discussed with his attorney. They also err in stating that no debt was owed to FTB, which the Debtor testified was his belief because he had

---

**10.** In this connection, the Court notes that Kent filed no response to BTI's summary judgment motion seeking the drastic remedy of discharge revocation. Kent has since retired from the practice of law.

received no notices from that creditor. The Chapter 13 documents were amended in September 2002 after Sutton replaced Kent as Debtor's counsel, although BTI argues that the amendments were made merely in response to BTI's dismissal motion rather than in a good faith attempt to correct inaccuracies. There is no question but that the Debtor should have been more careful about what he signed, but the fact is that he was relying on the assistance and advice of a paralegal and two successive attorneys. He testified that he did "the best I could" to furnish information and believed that what he signed was accurate; with the Chapter 13 documents, he also believed that his attorney had used the information provided to complete them properly. It is a responsible, rather than "cavalier", approach to seek professional assistance in filing bankruptcy, which is what the Debtor did in both the Chapter 7 and the Chapter 13 cases. The evidence does not show that he attempted to withhold information or mislead anyone,[11] it merely shows insufficient attention to details by all involved—such negligence is not commendable, but it is less culpable than bad faith.

BTI argues that the Debtor's post-nuptial agreement, deposits into his wife's bank account, and keeping the Jaguar at his wife's property all display bad faith. The post-nuptial agreement has been in effect since 1988 and there is no evidence that it is not valid and enforceable—such agreements are recognized by the law and this one clearly was not created in contemplation of the Chapter 13 case that was filed fourteen years later. As for depositing customer's checks into the wife's ac-

count, the Debtor testified without contradiction that he did so because he owed her money for rent and loans—and he said that he often cashed his customers' checks, or was paid in cash. With respect to the Jaguar, the Debtor testified that his sons live at his wife's property and had possession of the car to restore it as a Father's Day gift; that is a plausible explanation and there was no evidence to the contrary.

BTI contends that the Debtor's statements to Lietzke and BTI that he would not pay them shows that he filed Chapter 13 in a bad faith attempt to avoid his debts. The evidence is that the Debtor told Lietzke that her collection efforts were futile because he was going to file bankruptcy, and that he told Mittelstet there was "no way he would pay" the disputed commission to BTI. The context shows that those comments were no more than hyperbole—they appear to have been uttered in frustration or temper (*e.g.*, Mittelstet said that the Debtor was "angry and assertive" and "outraged" about BTI's payment demand), but they do not demonstrate a bad faith attempt to avoid legitimate debts. With each of these creditors, the Debtor had a dispute that resulted in judgment against him and he has now proposed a Chapter 13 Plan that provides for the judgment debts to be paid in part from all disposable income over the maximum available term of five years—that is the purpose of Chapter 13.

As for whether the Debtor filed Chapter 13 in a bad faith attempt to discharge debts that would be non-dischargeable in Chapter 7, the evidence does not support such a conclusion. BTI's claim is based on

---

**11.** For example, the Debtor and/or Kent should have determined whether the Jaguar had actually been sold by a lienholder—when the Debtor was told by Sutton to "check it out", he was able to do so in a day or less. But the car was exempt, so the original fail-ure to schedule it as an asset did not prejudice creditors or the estate—and the car was disclosed from the outset, albeit incorrectly identified as having been seized by a lienholder.

Debtor's failure to pay the commission called for by the parties' Agreement. The Debtor testified that he intended to perform under the Agreement with BTI when he entered into it and only changed his mind several months later—Mittelstet himself testified that the Debtor seemed "very motivated" to sell when the Agreement was made.[12] Under such circumstances, BTI's claim is based on breach of contract and would not be excepted from a Chapter 7 discharge as fraud under § 523(a)(2)(A), or on any of the other grounds provided by § 523(a). The only grounds under § 523(a) that might apply to Lietzke's claim would be fraud under § 523(a)(2)(A) or willful and malicious damage to property under § 523(a)(6). The latter requires a subjective intent to harm, pursuant to *In re Su,* 290 F.3d 1140 (9th Cir.2002) and *In re Jercich,* 238 F.3d 1202 (9th Cir.2001), and there is no evidence that the Debtor bore such intent when he damaged the marble and fixtures in Lietzke's home. With respect to fraud, BTI argues that the Debtor made a "blatant misrepresentation" to Lietzke that he held a contractor's license and Lietzke's claim would therefore be non-dischargeable in Chapter 7—however, Lietzke only asked him if he was licensed, without specifying whether she referred to a contractor's license or a business license. In any event, it is not likely that the Debtor decided to file Chapter 13 in a bad faith attempt to avoid Lietzke's judgment for $3,705, when he was faced with BTI's judgment for over $90,000. Rather, it appears that, after BTI's pursuit of its claim resulted in revocation of the Chapter 7 discharge, the Chapter 13 petition was filed to address that claim, with Lietzke's claim becoming a minor part of that larger process.

The Debtor's conduct has not been exemplary, and his demeanor at trial was defensive. Nevertheless, his testimony was essentially credible and the totality of the circumstances as shown by the evidence does not support a finding that the Chapter 13 case was commenced in bad faith.

## B. Confirmation

BTI objects to confirmation of the Debtor's Plan on each of several bases.

■ First, § 109(e) provides that only an individual with regular income is eligible to be a Chapter 13 debtor. BTI argues that the Debtor's testimony at the § 341 meeting showed that he earned nothing as a "trainer" because that business did not yet have any sales. However, the Debtor testified at trial without contradiction that he does earn income from his sealing work, which is somewhat seasonal as to amount but with a "good average" of $1,800 per month.

■ Second, § 1325(b) provides that a debtor whose plan proposes to pay less than 100% to general unsecured creditors must devote all disposable income to the plan for at least three years, and "disposable income" is defined as that which is not reasonably necessary for the support of the debtor or a dependent. BTI argues that discrepancies between the documents filed in the two bankruptcy cases, plus inconsistent testimony at the § 341 meeting, make it impossible to determine

---

12. *The fact that the Debtor rejected Herman's offer to pay the increased asking price does not mean that he lacked intent to perform when he entered into the Agreement almost a year earlier. The Debtor said that he did not consider Herman's offer "legitimate" because* Herman knew that the Debtor no longer wished to sell and might not be "very motivated" to train a buyer. Herman did not testify, but the Debtor's impression about that offer under those circumstances is not necessarily an unreasonable one.

whether all disposable income is devoted. However, the Debtor testified at trial without contradiction that the income and expenses listed in the Chapter 13 Schedules are accurate—none of the expenses appears unreasonable (nor does BTI allege as much). Those income and expense amounts show disposable income of $225 per month and the proposed Plan calls for $200 per month to be paid to the Trustee for sixty months, which meets the disposable income test.

 Third, § 1325(a)(4) provides that a Chapter 13 plan must pay general unsecured creditors at least as much as they would receive if the bankruptcy estate's assets were liquidated under Chapter 7, i.e., the plan must meet the "Chapter 7 test".[13] BTI argues that the Chapter 13 Schedules value the Debtor's business at only $100, whereas he told the Trustee its value is $15,000 to $20,000—and $15,000 to $20,000 is more than the $12,000 that the Plan proposes to distribute (less administrative expenses) over its sixty month term. However, the Debtor testified at trial that the figure he stated to the Trustee was the amount that he would like to receive if he were to sell the business, and he did not believe that the business would actually be worth anything if it were not sold along with his own covenant not to compete. That testimony is plausible on its face and is also consistent with the testimony of Mittelstet, an experienced business broker, who said that it would not be "feasible" to sell a service business without including such a covenant. The Debtor testified without contradiction that his business consists primarily of his own services—since a bankruptcy trustee could not sell those, the liquidation value of such

a business in Chapter 7 would necessarily be limited to its tangible assets. Those were described as a 1956 truck, rags, and chemicals, which clearly are not worth more than the $12,000 that the proposed Plan offers.

 Finally, BTI argues that the Debtor's Plan has been proposed in bad faith, citing *In re Warren*, 89 B.R. 87 (9th Cir. BAP 1988). That case sets forth a non-exclusive list of factors to be considered, and BTI contends that the factors applicable to this case show bad faith, as follows:

Whether all disposable income is devoted. BTI argues that it is not, but this Court finds that it is, as discussed above.

The Debtor's earning history. BTI argues that the Debtor used to earn much more than he now claims to, without explaining the change. However, the Debtor testified without contradiction that the CBECK business collapsed due to his gambling habit and resultant neglect, he has since attempted unsuccessfully to establish a training business but has been limited to sealing stone, and he expects that state of affairs to continue for "the rest of my life".

Length of the proposed Plan term. BTI argues that the term is not long enough to pay the FTB secured claim in full as required by the Bankruptcy Code, but that claim has been amended to a general unsecured one, as discussed above. Further, the Debtor's proposed Plan extends for the full five years that is the maximum available term under Chapter 13.

---

**13.** At trial, BTI's counsel stated that its objection based on the Chapter 7 test would not include an argument made in its pleadings that revocation of the Chapter 7 discharge would permit BTI to recover 100% under Chapter 7. That theory is at odds with the statute's plain language referring to recovery upon liquidation of the *estate* (not from *the debtor*), and it has been rejected by *In re Klein*, 57 B.R. 818 (9th Cir. BAP 1985).

Accuracy. BTI argues that the many discrepancies show an attempt to mislead the court, but this Court finds otherwise, as discussed above.

Modification of secured creditors' rights. BTI argues that the proposed Plan fails to provide for FTB's secured claim, but that claim has been amended to a general unsecured one, as discussed above.

Debts that would be non-dischargeable in Chapter 7. BTI argues that to be the case with the claims of BTI and Lietzke, but this Court finds otherwise, as discussed above.

Special circumstances. BTI claims that the Debtor stated a lack of intent to pay his creditors. However, as discussed above, this Court finds that those statements do not show bad faith. Further, the Debtor's proposed Plan demonstrates an intent to pay creditors as much as he is able to pay them each month, over the maximum available term of five years.

The Debtor's proposed Plan is not unconfirmable for any of the reasons stated by BTI.

### CONCLUSION

For the reasons set forth above, BTI's motion (in which Lietzke joins) to dismiss this case, and BTI's objection to confirmation of the Debtor's proposed Plan must both be, and hereby are, denied.

Counsel for the Debtor shall submit a form of order so providing, after review by Lietzke and counsel for BTI as to form.